**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALAN DONNELLY on behalf of himself and others similarly situated, | ) ) | |
| Plaintiff, | ) | 09 C 2264 |
| | ) | |
| v. | ) | Judge Guzman |
| | ) | |
| NCO FINANCIAL SYSTEMS, INC., | ) | Magistrate Judge Nolan |
| Defendant. | ) | |
| | ) | JURY DEMANDED |

**AMENDED COMPLAINT**

**CLASS ACTION**

1.     Plaintiff Alan Donnelly brings this action to secure redress for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA") and the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. ("FCRA").

**JURISDICTION AND VENUE**

2.     This Court has federal question subject matter jurisdiction over the FDCPA claims under 28 U.S.C. §§1331, 1337, and 15 U.S.C. §1692k.   The Court has federal question jurisdiction and Class Action Fairness Act jurisdiction over the TCPA claims.  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005).  There is also supplemental jurisdiction under 28 U.S.C. § 1367, if *Brill* were to be overruled or abrogated for some reason, because the TCPA claims form part of the same case or controversy as the FDCPA claims.

3.     Venue is proper because a substantial portion of the events complained of occurred in this District.

1

**PARTIES**

4.      Plaintiff is an individual who reside in this district.

5.      NCO Financial Systems, Inc. ("NCO") is a debt collection agency that does business in this District.  Its registered agent in Illinois is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

**FACTS**

6.      Defendant has made several telephone calls to plaintiff Donnelly's cellular telephone, including on April 1, 2. 6, 8, 11, and 14, 2009.

7.      Some or all of the calls to each plaintiff were made with one of NCO's thirty-three predictive dialers.  Each of NCO's thirty-three predictive dialers is regularly used to dial telephone numbers in such a way that no human intervention is necessary.

8.      NCO's predictive dialers are CR Software LLC "Mercury Predictive Dialers" ("MPD").

9.      NCO uses its MPDs to rapid-fire dial telephone numbers in order to attempt to contact alleged debtors.

10.      If a person answers a phone that was dialed by the MPD, the system attempts to connect the recipient of the call with a live agent or employee of NCO.

11.      If voice mail picks up, sometimes the MPD leaves a prerecorded voice message on the voice mail.  Sometimes, it just hangs up.

12.      NCO purchased and uses the MPD in order to increase efficiency.

13.      CR Software LLC describes its MPD as such:

Outbound Predictive Dialing: This is the core functionality of a predictive dialer. You designate a campaign of a large list of phone numbers to dial.

The dialer calls those numbers as quickly as technology allows and then routes the "live connects" (debtors) to your collectors who are logged into the campaign.

Bad phone numbers, answering machines, and operator intercepts are booked transactions and either redialed at a later time or moved to other processes as defined.

The dialer also regulates the rate it dials automatically so that your collectors don't get more calls than they can handle.

Typically, a group of collectors on the Mercury dialer will have four times (400%) more calls and talk time than collectors dialing manually.

And just in case you're wondering, collectors love taking calls on dialer campaigns because they collect more money that way.

(Exhibit A; Paragraph breaks supplied).

14.     This description of the MPD is accurate as to one or more of NCO's MPDs.  Upon information and belief, this description is accurate as to *all* of NCO's MPDs.

15.     NCO also sometimes leaves prerecorded voice mail messages when it makes calls.

16.     The automated messages are designed to comply with the requirements of *Foti v. NCO Financial Systems, Inc.*, 424 F.Supp.2d 643 (S.D.N.Y. 2006), which was recently implicitly affirmed in the Eleventh Circuit in *Edwards v. Niagara Credit Solutions, Inc.*, --- F.3d ----, 2009 WL 3273300 (11th Cir. Oct. 14, 2009).

17.     More than forty of the 128 million calls made with NCO's MPD since August, 2008, were made to cell phones in the 773 and 312 area codes.

18.     NCO left more than forty automatic voice messages since August, 2008 for cell phones in the 773 and 312 area codes.

19.     Defendant left automated voice mail messages for plaintiff Donnelly when it made some or all of its calls to Donnelly.

20.    NCO knows that its calls are regulated by the TCPA.   It entered into a "sweetheart" class action settlement and injunction in the case *Bellows v. NCO*, case no. Case No. 3:07-cv-01413-W-AlB (S.D.Cal.) for almost identical claims.   The injunction permits NCO to keep calling cell phones using its autodialers and prerecorded messages.   Although the "Settlement Fund" was $950,000, approximately half of that amount reverted to NCO because there were only 29 claim forms.   Each of the 29 claimants received $70.   There were an estimated 512,000,000 autodialed calls during the class period, worth a statutory minimum of $500 apiece if made to cell phones.   NCO paid the class members $2,030 and the attorneys $300,000.

21.    NCO's "policy" as to TCPA compliance is "don't ask don't tell."   NCO "trusts" that the telephone numbers it receives from its creditor clients are not cell phone numbers, and/or were provided to the creditor by the consumer, unless the creditor specifically tells NCO that the phone numbers are cell phone numbers.   If NCO knows that phone numbers are cell phone numbers, it does not use its MPDs.   Upon information and belief, based upon NCO's discovery responses, this is its only TCPA compliance procedure.

22.    Unfortunately for debtors, NCO's policies turn a blind eye to the fact that many of the phone numbers it calls with its autodialers are cell phone numbers.

23.    NCO obtains some numbers it calls from skip tracing companies or other third parties that are unrelated to creditors.

24.    Upon information and belief, NCO made a decision to continue using its MPD and prerecorded messages, at least partially based upon the theory that a TCPA class cannot be certified.   In other words, NCO made the economic decision to continue using its autodialers

and prerecorded messages without first checking whether the phone number it has is a cell phone because it would only have to defend (and settle) individual TCPA lawsuits.

25.    Avoiding the violations alleged herein would have been possible for NCO, although NCO might argue that it was not economically feasible.

26.    NCO has telephones that are only capable of making calls that are dialed through human intervention.  NCO has employees capable of speaking with debtors on the phone, personally.

27.    The TCPA does not restrict calls to cell phones that are dialed by humans, and where humans are present on the line when the person called (or his voice mail) picks up.

28.    In continuing to use its MPD, NCO puts law-abiding debt collection agencies at a competitive disadvantage.  These illegal systems are vastly more efficient and powerful than having a human being dial phone numbers.

### COUNT I – Telephone Consumer Protection Act – Class Claim

29.    Plaintiff incorporates all paragraphs of this Complaint.

30.    The Telephone Consumer Protection Act, 47 U.S.C. 227 restricts the making of telephone calls to cellular phones for commercial purposes that are made using "any automatic telephone dialing system or an artificial or prerecorded voice."  TCPA, §227(b)(A)(iii).

31.    Defendant made multiple telephone calls to plaintiff's cell phone using an automatic telephone dialing service and/or an artificial or prerecorded voice, as proscribed by the TCPA.

32.    Defendant's violations were negligent.

**CLASS ALLEGATIONS**

33.    Plaintiff brings Counts I, II and IV on behalf of a class pursuant to Fed.R.Civ.P.

23(b)(3).  The class is defined as:

**All natural and juridical persons within the area codes 312 and 773 who were called by NCO, without prior express consent, on their cellular telephone service through the use of any automatic telephone dialing system (including a predictive dialer, an automated dialing machine, dialer, and auto-dialer) or artificial or prerecorded voice, at any time after August 19, 2008.  The Class Members shall not include any officer, director, attorney, or heir or assign of NCO. Further, the Class Members shall not include any judicial officer or juror who may consider this case.**

34.    Plaintiff alleges two subclasses for Counts I and II:

a.    HIPAA Subclass:  All persons within the above class where NCO made such calls

on behalf of a "covered entity" as defined in HIPAA.

b.    Debt Buyer Subclass:  All persons within the above class where NCO made such

calls on behalf of a party other than the original creditor, such as a debt buyer;

35.    The class definition above is modeled after, and is substantially similar to, the

class definition NCO agreed to in the *Bellows* settlement.  *Bellows v. NCO Financial Systems,*

*Inc.*, 2008 WL 4155361, at * 6-8 (S.D.Cal. Sept. 5, 2008).  The *Bellows* court was required to do

an independent analysis of whether the settlement class met the requirements of Fed.R.Civ.P.

23, and found that it did. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997),

36.    The only items that have been substantively changed from the class that was

certified in *Bellows* are the time period and geographical limitation.  The subclasses were not a

part of the Bellows settlement.

37.    In its Second Amended Answer and Affirmative Defenses to the original

Complaint, NCO raised a "prior express consent" defense.

38.    NCO does not know who, if any, of the class members provided "prior express consent" to be called using an autodialer or prerecorded or artificial message, except that NCO believes that plaintiff provided such.

39.    Furthermore, the *Leckler I*, and section 227(b) definitions of "prior express consent" apply to the persons who fall into either one of the following two subclasses.

<u>Explanation of HIPAA Subclass</u>

40.    The general rule under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") is that "covered entities" such as doctors are prohibited from sharing "protected health information" such as patient names, addresses, telephone numbers and medical information with "business associates" such as debt collectors like NCO Financial Systems, Inc.  45 C.F.R. §164.502.

41.    A very limited exception exists:  HIPAA permits sharing the "minimum [protected health information] necessary to accomplish the intended purpose of the use, disclosure or request." 45 C.F.R. § 164.502(b).

42.    Debt collectors are not "entitled" to call debtors in their efforts to collect debts. Calling debtors is not "necessary" to the collection of debts.  The only required communications under the FDCPA are written.  15 U.S.C. §§ 1692g, 1692e(11).  There are requirements for oral communications, but there is nothing that requires that a debt collector call a debtor, and there is nothing that expressly permits such, either.

43.    A debtor's telephone number is therefore not part of the "minimum necessary" to collect a debt, and defendant is and was not entitled to know the telephone numbers of the class members.

44.     Furthermore, because HIPAA prohibits disclosure of telephone numbers to debt collectors, patients who gave their cell phone numbers to "covered entities" had a reasonable expectation that the covered entity would comply with HIPAA.  Because the sharing of the telephone number impermissible, any consent provided to the "covered entity" would not transfer to the "business associate."

45.     Therefore, NCO had no right to know (at least from the debt buyer), or consent to call, plaintiff and the HIPAA subclass' telephone numbers, regardless of whether the telephone number was provided to a "covered entity" in connection with the underlying medical transaction, for debt buyer accounts.

<u>Explanation of Debt Buyer Subclass</u>

46.     The general rule under 47 U.S.C. §227(b)(1)(A)(iii), is that no entity:

> may make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice
> ***
> to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

47.     "Prior express consent" within the meaning of the statute is extremely limited, and is <u>not</u> evinced by a consumer simply giving the creditor his telephone number. *Leckler v. CashCall*, 554 F.Supp.2d 1025, 1029 (S.D.Cal. 2008) ("*Leckler I*"), vacated on distinguishable grounds *Leckler v. Cashcall, Inc.*, 2008 WL 5000528 (N.D.Cal. Nov 21, 2008) ("*Leckler II*").

48.     The *Leckler I* was vacated on reconsideration because the Court found that the Hobbs Act, 28 U.S.C. § 2342, prohibited the Court from invalidating the Federal Communications Commission's January 4, 2008 ruling, 07-232 (<u>Exhibit B</u>), which holds that

provision of a cell phone number to a creditor in connection with an application for credit constitutes "prior express consent."

49.    *Leckler II* and the January 4, 2008, FCC order are inapplicable to the Debt Buyer subclass because the FCC Order does not mention, or contemplate, debt buyers. It does mention "creditors" but context makes clear that the FCC meant to include only creditors who accept applications.

> The creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications.  [Id. At ¶10]
>
> We encourage creditors to include language on credit applications and other documents informing the consumer that, by providing a wireless telephone number, the consumer consents to receiving autodialed and prerecorded message calls from the creditor or its third party debt collector at that number. See, e.g., EPIC Comments at 5 (creditors should be directed to obtain express authorization from customers in writing).  [*Id*. at fn. 37]

50.    Even ACA International, the organization that requested the January 4, 2008, order, has advised that the FCC ruling does not transfer consent from the original creditor to a debt buyer.

51.    In an ACA International teleseminar entitled, "Don't Get Hung Up: Dial ACA's TCPA Experts" (February 25, 2009) the marketing flyer for which is attached as <u>Exhibit C</u>, expert TCPA and FDCPA attorneys  experts John H. Bedard, Esq., of Franzen & Salzano P.C., and David Kaminski, Esq., of Carlson & Messer LLP opine that "prior express consent" is <u>not</u> transferred to debt buyers.

> Moderator:  Can prior cell consent be transferred to debt buyers when we purchase the account?
>
> Answer:  No.

Don't Get Hung Up: Dial ACA's TCPA Experts, at 1:15:00 - 1:15:07.

Moderator:  John, I think you already answered this, but there has been a few questions popping up.  Does consent transfer from creditor to the debt purchaser?

Mr. Bedard:  I think the answer is probably no.

Moderator:  Okay

Mr. Bedard:  Here's why:  Let's follow the chain of consent here.  Let's say the creditor does not have consent, okay?  The creditor sells it to a debt buyer, alright, the debt buyer now does not have consent.  The debt buyer places the account with a collector, a very diligent collector like all of the ones that are on this telephone call, and the collector dials the phone manually and says "Hello, Ms. Consumer, may I call your cell phone number using our dialer?" and the consumer says, "Yes, please call me all the time, anytime."  And so now the collector has consent to call using the dialer.  I believe that consent transfers back up to the debt buyer because the collector is the agent of the debt buyer.  However, when that consent, when that debt buyer sells that account to somebody else, I'm not certain that that consent travels with it because under the law it's gotta be express prior consent, and according to the FCC, the consent has to be given to the creditor, i.e. the person who is, you know, making the calls.  So I'm not certain that consent can travel that way.  David, do you have any thoughts on that?

Mr. Kaminski Answer:  No.  I don't think it can travel that way, and that's the problem there.  I think consent is specific and I think it's also going to be narrowly interpreted by the courts.  I mean, the FCC, in a sense, gave us a quasi-present in the FCC ruling, but how they're going to expand that consent and to who can take advantage of it, I think it's going to be narrowly interpreted.

Mr. Bedard Following Up:  Now, let's change that fact pattern one way.  Let's say the collector obtains consent that consent then travels back up to the creditor, the collector never gets a payment on that account, so the creditor pulls that account back and places it with agency number two.  Does Agency Number Two have consent to call?  Yes.  Because the creditor, their creditor now has consent, and that consent is going to pass back down to the second agency.

Don't Get Hung Up: Dial ACA's TCPA Experts, at 1:20:12 to 1:22:48.

52.     Upon information and belief, there are more than 50 members of the proposed

class and each subclass; sufficient to satisfy the numerosity requirement.

53.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting any individual member of the class, including plaintiff. Such questions common to the Class include, but are not limited to:

    a.    Whether defendant used an automatic telephone dialing system and/or an artificial or pre-recorded voice within the meaning of the TCPA with respect to telephone calls to class members' cellular phones;

    b.    Whether such practices violate the FDCPA; and

    c.    Damages.

54.    Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing his claims vigorously, and has retained counsel competent and experienced in class and complex litigation.

55.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

56.    No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

57.    Defendants have acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the class, should they realize their rights have been violated, would

likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

58.     The identity of the class is likely readily identifiable from defendants' records.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

WHEREFORE, plaintiff requests that this Court enter judgment in favor of plaintiff and the class and against defendant for:

(a)     Statutory damages of $500 per call;

(b)     Any other relief the court deems proper.

### COUNT II – TCPA – Class Claim -- Willful

60.     Plaintiff incorporates all previous paragraphs of this complaint.

61.     The violations of the Telephone Consumer Protection Act, 47 U.S.C. 227, identified above when used in connection with collection of a consumer debt were willful.

62.     Plaintiff brings this Count on behalf of the same class and subclass as is identified in Count I.  The difference is that this Count alleges that the violations were "willful" within the meaning of the TCPA, and thus justify enhanced damages of three times the statutory amount of $500, for $1,500 per call.

(a)     Statutory damages of $500 per call, or up to $1500 per call if defendant's actions are found to have been willful;

(b)     Any other relief the court deems proper.

### COUNT III – TCPA – Injunctive Relief

63.     Plaintiff incorporates all previous paragraphs of this complaint.

64.    The TCPA prohibits the use of an automatic dialing system and/or prerecorded or artificial voice messages to make phone calls to cell phones.

65.    The TCPA 47 U.S.C. §227(b)(3), provides a private right of action for injunctive relief.

66.    Defendant has had a pattern and practice of making telephone calls in violation of 47 U.S.C. §227(b), including calls to plaintiff.

67.    Upon information and belief, defendant continues to call cell phones in violation of section 227(b), without regard to the TCPA.

68.    The defendant is likely to continue to violate the TCPA without an order enjoining it from doing so.

69.    Plaintiff brings Count III on behalf of a class pursuant to Fed.R.Civ.P. 23(b)(2), for injunctive relief.  Plaintiff requests that the Court permanently enjoin defendant from making calls to cell phones using its MPD, and enjoin defendant from making calls to cell phones using an artificial or prerecorded voice message, unless it can show that the recipient provided prior express consent to receive such calls.

70.    Plaintiff is entitled to have his rights, status and legal relations under the TCPA relating to NCO's calling of cell phones using an automatic dialing system and/or artificial or prerecorded voice message.

71.    The class definition is identical and overlapping with the TCPA class in Count II in paragraph 33, except that it has no date restrictions and no geographical restrictions.

WHEREFORE, plaintiff requests that this Court enter judgment for plaintiff and the class and against defendants for:

(a)    a permanent injunction prohibiting Oxford from violating the TCPA in the future through calling cellular phones using an automatic telephone dialing system and/or a prerecorded voice message; and

(b)    Any other relief the Court deems fit.

### COUNT IV – FDCPA – Individual Claim

72.    Plaintiff incorporates all previous paragraphs of this complaint.

73.    The violations of the Telephone Consumer Protection Act, 47 U.S.C. 227, identified above when used in connection with collection of a consumer debt are unfair and unconscionable under 15 U.S.C. § 1692f and are a deceptive practice under 1692e, and otherwise violate the FDCPA.

WHEREFORE, plaintiff requests that this Court enter judgment for plaintiff and against defendant for:

(a)    Statutory damages;

(b)    Attorney's fees and costs of suit;

(c)    Any other relief the Court deems fit.

### COUNT V – FCRA – Individual

74.    Plaintiff Donnelly incorporates all previous paragraphs of this complaint.

75.    NCO accessed Donnelly's credit report in January 2009.

76.    NCO did not have a permissible purpose for accessing Donnelly's credit report.

77.    The general rule is that a third party cannot access another person's credit report for any reason.

78.    The FCRA, 15 U.S.C. §1681b delineates permissible purposes for obtaining a credit report.

79.    The only conceivable permissible purpose NCO might have had to obtaining

plaintiff's credit report was 1681b(a)(3)(A), which provides:

> Subject to subsection (c) of this section, any consumer reporting agency may furnish a
> consumer report under the following circumstances and no other:
> ***
> (3) To a person which it has reason to believe—
>> (A) intends to use the information in connection with a credit transaction
>> involving the consumer on whom the information is to be furnished and
>> involving the extension of credit to, or review or collection of an account of, the
>> consumer...

80.    As the Ninth Circuit recognized earlier this year, not all debts that are collected

amount to "credit" transactions that give rise to a permissible purpose to pull a credit report.

*Pintos v. Pacific Creditors Ass'n*, 565 F.3d 1106 (9th Cir. 2009).

81.    Pintos interpreted "credit transaction involving the consumer" as necessarily

being a voluntary transaction:

> As the Seventh Circuit held in *Stergiopoulos v. First Midwest Bancorp, Inc.*, 427 F.3d
> 1043, 1047 (7th Cir.2005), § 1681b(a)(3)(A) can be relied upon by the party requesting a
> credit report "only if the consumer initiates the transaction."

*Id*. At 1112-13.

82.    The occurrence that led to the alleged debt that NCO was collecting from

Donnelly in this case was a hospital debt that arose out of Donnelly being the victim of a hit-

and-run.

83.    Upon information and belief, in January 2009, NCO did not take steps to

determine whether the transactions underlying the debts it was collecting were "initiated" by

the consumer.  *Pintos* had already been decided at that point.

84.    Upon information and belief, the only documentation that NCO had regarding

plaintiff in 2009 was a data file it had received, which included no information as to whether

the transaction was initiated by the consumer, and no information regarding whether plaintiff consented to being called on his cell phone with a predictive dialer or prerecorded voice message.

85.     NCO accessed plaintiff's credit report without having had a permissible purpose to do so.

WHEREFORE, plaintiff requests that this Court enter judgment for plaintiff and the class and against defendants for:

a.     Statutory, actual and punitive damages;

b.     Attorney's fees and costs of suit;

c.     Any other relief the Court deems fit.

Respectfully submitted,

/s/Alexander H. Burke

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

**JURY DEMAND**

Plaintiff demands trial by jury.

/s/Alexander H. Burke

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601

(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

# Exhibit A





PRODUCTS

- Titanium ORE
- Platinum
- Mercury Predictive Dialer
- Document Imaging
- Atlas ASP
- Call Recording
- Disaster Recovery



**Mercury Predictive Dialer and Pegasus IVR**

The Mercury Predictive Dialer (MPD) is a real-time integrated, full-featured telecommunications system that works seamlessly with the Collection Resource System to create a fully integrated and automated collections software package that gives you better results.

The MPD is integrated as part of the Collection Resource system. Collectors use the same screens for predictive dialing as for manually placed calls; there are no separate screens, so learning to use this dialer is only a matter of remembering a few keystrokes. And the MPD works with existing phone and computer systems, so that you have the ability to locate your agents at any remote location where there's a phone and a computer. Collectors can even use the Mercury Dialer to work from home.

In addition to offering easy real-time campaign setup and management, the Mercury Predictive Dialer provides real-time statistics that allows you to modify your campaigns for optimum performance on the fly!

With its real-time capabilities, the MPD guarantees that you will not call outside of allowable times nor call consumers multiple times in the same day. Inbound calls can be routed to the correct staff members on your teams and the consumer information is pulled up automatically based on incoming call information.

The Mercury Dialer's many features make it a complete solution for your inbound and outbound calling needs:

- Flexible outbound calling campaigns that can be managed on the fly.
- Inbound calls routed to the best possible agent by accessing user defined skills based routing tables.
- Blended agents allowing both inbound and out bound traffic for more productive use of agent work time.
- Real-time integration guarantees the system will comply with FDCPA, state, and client policies.
- Collector monitoring/coaching allows managers to listen to agent transactions as well as assist staff with challenging contacts.
- CRS Messenger leaves pre-recorded messages for real contacts or answering machines. Allows for contacts outside of regular staff hours.
- Inbound IVR allow consumers to verify personal and financial information and make actual payments without agent intervention.
- Outbound IVR gives you the ability to set up calling campaigns that identify right party contacts and connect them to qualified agents.
- Skills based routing can be utilized with any inbound calls to route consumers to the most qualified agent to best handle getting payment on the account.
- Call Recording gives you the added security to record dialer calls for training and compliance purposes. Utilizing Non-Predictive agent licensing

(NPA) gives you a cost effective method for all of your staff, dialer and non-dialer, to be recorded on the same system. A browser based GUI interface allows for easy retrieval of recordings.

- Real-time statistics include online agent and line monitoring, contact statistics and payment information that give you the ability to tune your campaigns on the fly and monitor staff performance.
- Database reporting - utilize ODBC compliant database files to pull real-time reports for more in depth analysis and statistics.

**Feature Definitions**

**Outbound Predictive Dialing:** This is the core functionality of a predictive dialer. You designate a campaign of a large list of phone numbers to dial. The dialer calls those numbers as quickly as technology allows and then routes the "live connects" (debtors) to your collectors who are logged into the campaign. Bad phone numbers, answering machines, and operator intercepts are booked transactions and either redialed at a later time or moved to other processes as defined. The dialer also regulates the rate it dials automatically so that your collectors don't get more calls than they can handle. Typically, a group of collectors on the Mercury dialer will have four times (400%) more calls and talk time than collectors dialing manually. And just in case you're wondering, collectors love taking calls on dialer campaigns because they collect more money that way.

**Inbound capabilities:** Your agency's inbound calls can be handled by the dialer. The dialer recognizes the phone number of the caller, searches the database, then automatically "screen pops" the debtor information for the collector and routes the call to an available inbound agent.

**Interactive Voice Response (IVR):** This is the ability to have inbound calls routed by the caller pressing buttons on their phone without interacting with a receptionist. For example, "Press '1' if you received a notice. Press '2' to make a payment without talking to an associate." The most common uses for IVR are call routing, answering commonly recurring questions (directions, instructions, mini-Miranda/disclosure statement, etc.) and automated payment processing.

**Messenger capabilities:** This allows you to run an unattended outbound messaging campaign. You record a message, have the dialer call a campaign of phone numbers and then play that message to the person or answering machine that answers the call. No live employees or collectors are required for this totally automated function. Great for evenings and weekends. Collect money while you're home from the office.

**Outbound IVR:** Take the above messenger campaign and add a moneymaking twist. In the outbound message, you utilize TTS technology to ask the consumer to verify their identity. By verifying their identity, the call will be routed to a waiting agent for a right party contact. The caller can also be routed to the IVR to book a payment without agent intervention.

**Text To Speech:** This is used in conjunction with the IVR system. The phone prompts can take fields from the Platinum database and "say" that information to the debtor without human interaction. For example, the debtor can check their balance by entering their account number when prompted by the system and then have the dialer "say" to them what their balance is. For outbound calls, this capability is used for right party verification. "If you are 'Jim Smith' please press 1 now."

**Call Recording:** The Mercury Dialer has the ability to record collector conversations with debtors and then index these files to the debtor record in the CRS Platinum system. The biggest benefits are greater accountability of what your collectors are saying for law suit purposes, debtor complaints to the creditor (bring up the recording, e-mail it to your client and let's really see who was the one being rude), and internal call quality monitoring. Call-recording customers report a dramatic drop in collector personal calls and an increase in their customer service capabilities. A browser based GUI interface allows for easy retrieval of recordings. Also, utilizing Non-Predictive agent licensing (NPA) gives you a cost effective method for all of your staff, dialer and non-dialer, to be recorded on the same system.

**Skills Based Routing:** This is telephony technology at its best. Let's say you send

out notices with two telephone numbers listed, one for English and one for Spanish. When the debtor calls in, the dialer recognizes which number they called and automatically routes those calls to the appropriate English- or Spanish-speaking collector. This routing can be used for special clients, distinctive types of debt, high balance account routing, or anything else you can think of where you want special skills collectors handling specific types of calls.

**Coaching and Monitoring:** On the Mercury dialer, a designated supervisor can "listen in" live to collector calls. There are several modes for this interaction. The supervisor can listen in stealth mode and monitor the conversation with both parties unaware; he/she can listen in on coaching mode where the supervisor can talk to and prompt the collector without the debtor hearing the comments; or the supervisor can listen in on conference mode where both the debtor and collector can hear the supervisor's comments.

**Call Blending or Transfer Lines:** Typically, phone calls that are made from the dialer essentially reside within the dialer. Transfer lines or Call Blending allows for calls made on the dialer (inbound or outbound) to be routed outside of the logged in collectors to other employee extensions in your telephone system, or PBX, that may be outside of the dialer's collection unit, office, or department.

Copyright © 1998-2009. CR Software. All rights reserved | CR Software and Titanium ORE are trademarks/registered trademarks of CR Software LLC | All trademarks, trade names, logos, and service marks referenced on this Website belong to their respective companies.

<LEGAL>                                                                      <PRIVACY POLICY>

# Exhibit B

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | )      CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) |
| | ) |
| Request of ACA International for Clarification | ) |
| and Declaratory Ruling | ) |

**DECLARATORY RULING**

**Adopted:  December 28, 2007**                                    **Released:  January 4, 2008**

By the Commission:

## I.  INTRODUCTION

1.        In this Declaratory Ruling, we address a Petition for Expedited Clarification and Declaratory Ruling filed by ACA International (ACA).[1]  In this ruling, we clarify that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the "prior express consent" of the called party.[2]

## II.  BACKGROUND

### A.  Telephone Consumer Protection Act of 1991

2.        On December 20, 1991, Congress enacted the Telephone Consumer Protection Act (TCPA),[3] as codified in section 227 of the Communications Act of 1934, as amended, in an effort to address a growing number of telephone marketing calls and certain telemarketing practices Congress found to be an invasion of consumer privacy.[4]  In relevant part, the TCPA regulates the use of automated

---

[1] ACA International Petition for an Expedited Clarification and Declaratory Ruling filed October 4, 2005 (*Petition*).  ACA describes itself as an international trade organization of credit and collection companies that provide a wide variety of accounts receivable management services.  ACA represents approximately 5,800 company members ranging from credit grantors, collection agencies, attorneys, and vendor affiliates.

[2] Debt collection calls are regulated primarily by the Federal Trade Commission and are subject to the requirements of the Fair Debt Collection Practices Act (FDCPA), which prohibits abusive, deceptive, and otherwise improper collection practices by third-party collectors.  15 U.S.C. § 1692 *et seq.*

[3] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227 (TCPA).  The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*

[4] The TCPA directs the Commission, after comparing and evaluating "alternative methods," to adopt rules "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."  47 U.S.C. § 227(c)(1)-(4).

**Federal Communications Commission**    **FCC 07-232**

telephone equipment.[5] Specifically, section 227(b)(1)(A) prohibits the use of any automatic telephone dialing system[6] to call any telephone number assigned to a cellular telephone service absent an emergency purpose or the "prior express consent of the called party."[7] The TCPA also makes it unlawful to place a non-emergency telephone call to a residential line "using an artificial or prerecorded voice" without the recipient's consent unless the call is "exempted by rule or order of the Commission under paragraph (2)(B)."[8] Paragraph (2)(B), in turn, authorizes the Commission to enact limited exemptions from this ban, including an exemption for calls "that are not made for a commercial purpose" or "do not include the transmission of any unsolicited advertisement."[9]

3.    Section 227(b)(2)(B) authorizes the Commission to exempt noncommercial and certain other classes of calls from the prohibition on prerecorded messages <u>to residences</u>.  By comparison, section 227(b)(2)(C) gives the Commission authority to exempt from the prohibition on autodialed or prerecorded message calls <u>to wireless numbers</u> contained in section 227(b)(1)(A)(iii) only those "calls to

---

[5] 47 U.S.C. § 227(b).

[6] Under the TCPA, the term "automatic telephone dialing system" means "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).

[7] 47 U.S.C. § 227(b)(1)(A). ("It shall be unlawful for any person within the United States or any person outside the United States if the recipient is within the United States—(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency); (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call[.]").

[8] 47 U.S.C. § 227(b)(1)(B).  Subsection 227(b)(1)(B) provides:

It shall be unlawful for any person within the United States or any person outside the United States if the recipient is within the United States - (B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B)[.]

*Id.  See also* 47 C.F.R. § 64.1200(a)(2).

[9] 47 U.S.C. § 227(b)(2)(B)(i) and (ii).  Subsection (2)(B) states:

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission – (B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe – (i) calls that are not made for a commercial purpose; and (ii) such classes or categories of calls made for commercial purposes as the Commission determines—(I) will not adversely affect the privacy rights that this section is intended to protect; and (II) do not include the transmission of any unsolicited advertisement…

47 U.S.C. § 227(b)(2)(B).

a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights the provision is intended to protect."[10]

## B. Commission's TCPA rules

4.       The Commission first adopted rules implementing the TCPA in 1992.[11]  Under these rules, calls delivering artificial or prerecorded messages to residences were prohibited, absent the express consent of the called party.[12]  Exempted from this prohibition were certain categories of calls that the Commission determined did not adversely affect consumers' privacy rights.[13]  In the *1992 TCPA Order*, the Commission concluded that an express exemption for debt collection calls to residences was unnecessary as such calls fall within the exemptions adopted for commercial calls which do not transmit an unsolicited advertisement and for established business relationships.[14]  In addition, the Commission adopted rules prohibiting the use of autodialed and prerecorded message calls to cell phone numbers which incorporated the language of the TCPA virtually verbatim.[15]

5.       In 1995, the Commission released a Memorandum Opinion and Order addressing petitions for reconsideration of the *1992 TCPA Order*.[16]  Among other things, the Commission clarified that: 1) prerecorded debt collection calls are exempted from Section 227(b)(1)(B) of the TCPA which

---

[10] 47 U.S.C. § 227(b)(2)(C).

[11] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752 (1992) (*1992 TCPA Order*); *see also* 47 C.F.R. § 64.1200.

[12] 47 C.F.R. § 64.1200(a)(2).

[13] *1992 TCPA Order*, 7 FCC Rcd at 8769-73, paras. 32-39.  These exemptions included calls that are: 1) not made for a commercial purpose; 2) made for a commercial purpose but not do include the transmission of any unsolicited advertisement, 3) made to any person with whom the caller has an established business relationship; or 4) made by a tax-exempt nonprofit organization.

[14] *1992 TCPA Order*, 7 FCC Rcd at 8773, para. 39.

[15] *See* 47 C.F.R. § 64.1200(a)(1).  The Commission also determined that cellular carriers need not obtain additional consent from their cellular subscribers prior to initiating autodialer and artificial prerecorded message calls for which the cellular subscriber is not charged.  *1992 TCPA Order*, 7 FCC Rcd at 8775, para. 45. ("…neither TCPA nor the legislative history indicates that Congress intended to impede communications between radio common carriers and their customers regarding the delivery of customer services by barring calls to cellular subscribers for which the subscriber is not called [sic]").  However, the Commission determined that market research calls delivered by autodialers to cellular customers were prohibited by the TCPA absent the prior express consent of the subscriber.  *Id.* at para. 45.

[16] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397-98, para. 14 (1995) (*1995 TCPA Reconsideration Order*).

prohibits prerecorded or artificial voice messages to residences;[17] and 2) debt collection calls not directed to randomly or sequentially generated telephone numbers do not require an identification message.[18]

6.       In 2002, the Commission initiated a rulemaking proceeding to determine whether the Commission's rules needed to be revised to more effectively carry out Congress's directives in the TCPA.[19]  On July 3, 2003, the Commission revised and clarified the existing rules under the TCPA and adopted new rules to provide consumers with several options for avoiding unwanted telephone solicitations.[20]

7.       In particular, the Commission clarified the rules on autodialed and prerecorded message calls to wireless telephone numbers.  Specifically, the Commission affirmed that it is unlawful "to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number."[21]  Noting that Congress found that automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls, and that such calls can be costly and inconvenient, the Commission determined that the TCPA and its rules prohibit such calls to wireless numbers.  The Commission also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[22]  Finally, the Commission found that a

---

[17] *1995 TCPA Reconsideration Order, 10 FCC Rcd* at 12400, para. 17 ("We have specifically noted that 'prerecorded debt collection calls [are] exempt from the prohibitions on [prerecorded] calls to residences as . . . commercial calls . . . which do not transmit an unsolicited advertisement'" (*citing 1992 TCPA Order*, 7 FCC Rcd at 8773, para. 39)).

[18] *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12400-01, paras. 17 and 19.  *See also 1992 TCPA Order*, 7 FCC Rcd at 8773, para. 39 ("With respect to concerns regarding compliance with both the [Fair Debt Collection Practices Act] and our rules in prerecorded message calls, we emphasize that the identification requirements will not apply to debt collection calls because such calls are not autodialer calls (i.e., dialed using a random or sequential number generator) and hence are not subject to the identification requirements for prerecorded messages in 64.1200(e)(4) of our rules").

[19] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking and Memorandum Opinion and Order, 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90 (2002) (*2002 NPRM*).  In the *2002 NPRM*, and as relevant here, the Commission sought specific comment on the definition of "automatic telephone dialing system," and whether it was necessary to identify the technologies section 227 is designed to address.  The Commission also asked whether a predictive dialer is subject to the ban on calls to emergency lines, health care facilities, paging services, and any service for which the called party is charged for the call.  *2002 NPRM*, 17 FCC Rcd at 17473-75, paras. 23 and 26.

[20] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003) (*2003 TCPA Order*).

[21] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.  *See* 47 U.S.C. § 227(b)(1), which contains exceptions for calls made for emergency purposes or made with the prior express consent of the called party.

[22] *Id.*  The Commission also noted that callers have no way to determine how consumers are charged for their wireless service.  *Id.*

predictive dialer[23] falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.[24]

### C. ACA Petition

8.        On October 4, 2005, ACA filed a petition seeking clarification that the prohibition against autodialed or prerecorded calls to wireless telephone numbers in 47 C.F.R. § 64.1200(a)(1)(iii) does not apply to creditors and collectors when calling wireless telephone numbers to recover payments for goods and services received by consumers.[25] ACA maintains that the TCPA was enacted to curtail the "onslaught of telemarketing calls," and that the use of autodialers to attempt to recover payments is not telemarketing.[26] According to ACA, the Commission has always interpreted the autodialer restriction so as not to apply to debt collection calls.[27] On April 5, 2006, the Commission sought comment on ACA's petition.[28] In a supplemental filing on April 26, 2006, ACA argues that the Commission's determination that predictive dialers fall within the meaning of the statutory definition of "automated telephone dialing equipment" was incorrect and conflicts with the language of the TCPA.[29] The majority

---

[23] The Commission explained in its *2003 TCPA Order* that "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. . . [i]n most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at rate to ensure that when a consumer answers the phone, a sales person is available to take the call." *See 2003 TCPA Order*, 18 FCC Rcd at 14091, para. 131.

[24] *2003 TCPA Order*, 18 FCC Rcd at 14093, para. 133.

[25] *See supra* note 1. *See also Petition* at 12.

[26] *Petition* at 11-12.

[27] *Petition* at 14-20 (citing statements from the Commission that debt collection calls constitute neither telephone solicitations nor include unsolicited advertisements).

[28] *Consumer & Governmental Affairs Bureau Seeks Comment on ACA International's Petition for an Expedited Clarification and Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, 21 FCC Rcd 3600 (2006). Comments were due May 11, and replies were due May 22, 2006. *See* 71 Fed. Reg. 24634 (April 26, 2006).

[29] ACA International's Supplemental Submission to Petition for an Expedited Clarification and Declaratory Ruling, filed April 26, 2006 (*Supplemental Submission*). For purposes of this Declaratory Ruling, we treat ACA's supplemental petition as part of its original petition.

of comments filed were from creditors and collectors who support ACA's petition.[30]  Consumer groups and individual consumers also filed comments, most of whom opposed ACA's petition.[31]

## III.  DISCUSSION

### A.  TCPA Autodialer Prohibition and Prior Express Consent

9.        Although the TCPA generally prohibits autodialed calls to wireless phones, it also provides an exception for autodialed and prerecorded message calls for emergency purposes or made with the prior express consent of the called party.[32]  Because we find that autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt are made with the "prior express consent"[33] of the called party, we clarify that such calls are permissible. We conclude that the provision of a cell phone number to a creditor, *e.g.,* as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.  In the *1992 TCPA Order*, the Commission determined that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."[34]  The legislative history in the TCPA provides support for this interpretation.  Specifically, the House report on what ultimately became section 227 states that:

> [t]he restriction on calls to emergency lines, pagers, and the like does not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications.[35]

10.        We emphasize that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the

---

[30] *See, e.g.,* American Bankers Association and Consumer Bankers Association Comments (arguing that the relief requested by ACA should be extended to include all calls made using predictive dialers to wireless telephone numbers of existing customers), American Financial Services Association Comments, Chase Home Finance LLC Comments, Credit Management, LP Comments, Global Acceptance Credit Company Comments, Equinox Collection Service, Inc. Comments, National Association of Retail Collection Attorneys Comments.  *See also* AT&T Comments, Direct Marketing Association Comments, Verizon Comments.

[31] *See, e.g.,* Electronic Privacy Information Center (EPIC) Comments, National Association of State Utility Consumer Advocates (NASUCA) Comments, Robert Biggerstaff Comments, Office of the Indiana Attorney General Comments, Privacy Rights Clearinghouse Comments.

[32] 47 U.S.C. § 227(b)(1)(A).

[33] *See, e.g.,* Verizon Comments and AT&T Comments.

[34] *See 1992 TCPA Order*, 7 FCC Rcd at 8769, para. 31 (citing House Report, 102-317, 1st Sess., 102nd Cong. (1991) at 13, "noting that in such instances the called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications").  The Commission also noted, however, that if a caller's number is "captured" by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls.  *Id.*

[35] H.R. Rep. 102-317 at 17.

transaction that resulted in the debt owed.[36]  To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and prerecorded message calls, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent. The creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications.[37]  Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent.  Similarly, a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules.  Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.[38]

11.    We also reiterate that the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.[39]  We note that this prohibition applies regardless of the content of the call, and is not limited only to calls that constitute "telephone solicitations."[40]  However, we agree with ACA and other commenters that calls solely for the purpose of debt collection are not telephone solicitations and do not constitute telemarketing.[41]  Therefore, calls regarding debt collection or to recover payments are not subject to the TCPA's separate restrictions on "telephone solicitations."[42]

---

[36] *See Petition* at 5 ("The purpose of these telephone communications is to recover payment for obligations owed to creditors…They are limited to customers of creditors who have received a product without payment.  Typically the telephone number is provided by the customer for purposes or receiving calls, for example, as part of a credit application").

[37] We encourage creditors to include language on credit applications and other documents informing the consumer that, by providing a wireless telephone number, the consumer consents to receiving autodialed and prerecorded message calls from the creditor or its third party debt collector at that number.  *See, e.g.,* EPIC Comments at 5 (creditors should be directed to obtain express authorization from customers in writing).

[38] A third party collector may also be liable for a violation of the Commission's rules.  In addition, prior express consent provided to a particular creditor will not entitle that creditor (or third party collector) to call a consumer's wireless number on behalf of other creditors, including on behalf of affiliated entities.

[39] 47 U.S.C. § 227(b)(1)(A)(iii).  *See also 2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[40] *See* 47 U.S.C. § 227(b)(1)(A)(iii).  *See also* 137 Cong. Rec. S18781-02, S18785 (Nov. 27, 1991) (Statement from Senator Pressler that "[t]his bill also allows hospitals, police stations, fire stations, and owners of paging and cellular equipment to eliminate all unsolicited calls").

[41] In the *2003 TCPA Order*, the Commission stated that "the act of 'terminating' an established business relationship will not hinder or thwart creditors' attempts to reach debtors by telephone, to the extent that debt collection calls constitute neither telephone solicitations nor include unsolicited advertisements."  *See 2003 TCPA Order*, 18 FCC Rcd at 14079, para. 113 n.358.

[42] *See* 47 C.F.R. § 64.1200(e).  For example, the National Do-Not-Call List does not apply to calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3).  These include surveys, market research, and political or religious speech calls.  *See 2003 TCPA Order,* 18 FCC Rcd at 14039-40, para. 37.

### B. Predictive Dialers

12.      In this Declaratory Ruling, we affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers.  In its Supplemental Submission, ACA argues that the Commission erred in concluding that the term "automatic telephone dialing system" includes a predictive dialer.[43]  ACA states that debt collectors use predictive dialers to call specific numbers provided by established customers,[44] and that a predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists.

13.      As noted above, the Commission first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions.[45]  The Commission found that, based on the statutory definition of "automatic telephone dialing system,"[46] the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress.[47]  The Commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention.  The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology.[48]

14.      Moreover, the Commission noted that the TCPA does not ban the use of automated dialing technology.[49]  It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call.  Such practices were determined by Congress to threaten public safety and inappropriately shift costs to consumers.  Most importantly, the Commission said that, to find that calls to emergency numbers, health care facilities, and wireless numbers are permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists, would be inconsistent with the avowed purpose of the TCPA and the intent of Congress in protecting consumers from such calls.[50]  ACA raises no new

---

[43] *Supplemental Submission* at 4-18.  *See also supra* note 23.

[44] *Supplemental Submission* at 6, 10.

[45] *2002 NPRM*, 17 FCC Rcd at 17475, para. 26.

[46] *See supra* note 6.

[47] *2003 TCPA Order*, 18 FCC Rcd at 14092-93, para 133.

[48] *See 2003 TCPA Order*, 18 FCC Rcd at 14091-92, para. 132 (*citing* 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies").

[49] Debt collectors may use autodialing technology to call wireline numbers.  Debt collection calls fall within the exemption for prerecorded calls that are commercial, but do not include an unsolicited advertisement.  *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12400, para. 17.

[50] *2003 TCPA Order*, 18 FCC Rcd at 14092-93, para. 133.

information about predictive dialers that warrants reconsideration of these findings.[51]  With this ruling, however, creditors and debt collectors may use predictive dialers to call wireless phones, provided the wireless phone number was provided by the subscriber in connection with the existing debt.[52]  We note, however, that where the subscriber has not made the number available to the creditor regarding the debt, we expect debt collectors to be able to utilize the same methods and resources that telemarketers have found adequate to determine which numbers are assigned to wireless carriers,[53] and to comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to wireless numbers.[54]

## IV.  PROCEDURAL MATTERS

15.     To request materials in accessible formats (such as Braille, large print, electronic files, or audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (TTY).  This Declaratory Ruling can also be downloaded in Word and Portable Document Format at http://www.fcc.gov/cgb/policy.

## V.  ORDERING CLAUSES

16.     Accordingly, IT IS ORDERED that, pursuant to Sections 1-4, 227, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227 and 303(r); and Section 64.1200 of the Commission's rules, 47 C.F.R. § 64.1200, this Declaratory Ruling in CG Docket No. 02-278 IS ADOPTED as set forth herein.

---

[51] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Second Order on Reconsideration, 20 FCC Rcd 3788 (2005) (declining to reconsider the Commission's rules on predictive dialers and abandoned calls).

[52] *See supra* para. 9.

[53] *See 2003 TCPA Order*, 18 FCC Rcd at 14117, para. 170.  *See also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Order, 19 FCC Rcd 19215 (2004) (establishing a limited safe harbor period from the prohibition on placing automatic telephone dialing system (autodialed) or prerecorded message calls to wireless numbers when such calls are made to numbers that have been recently ported from wireline service to wireless service).

[54] *See 2003 TCPA Order*, 18 FCC Rcd at 14117, para. 170.  *See also* DMA Wireless Number Suppression List at http://preference.the-dma.org/products/wireless.shtml.  Neustar also has available a service that provides data on numbers ported from wireline to wireless service on a daily basis.  *See* http://www.tcpacompliance.com/.  ACA contends that the use of such databases is "inherently deficient" and not a viable solution for ACA members.  *See Supplemental Submission* at 29.

17.     IT IS FURTHER ORDERED that the Request for Clarification filed by ACA International in CG Docket 02-278 on October 4, 2005 and supplemented by ACA on April 26, 2006, IS GRANTED insofar as ACA seeks clarification that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the "prior express consent" of the called party, AND in all other respects, IS DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

# Exhibit C



## Teleseminar
presented by
*Campus* **ACA**®
A benefit of
ACA International

# Don't Get Hung Up: Dial ACA's TCPA Experts
## Wednesday, February 25, 2009
### 12:00 pm Eastern/11:00 am Central/10:00 am Mountain/9:00 am Pacific

### Get answers to <u>your</u> compliance questions surrounding autodialers!

The Federal Communication Commission released an Order last year in response to ACA International's Petition for Clarification and Relief on the right to use autodialers and prerecorded messages to contact consumers by way of their wireless phones.

Understand how the Order impacts your business operations and compliance program with ACA's leading TCPA experts John H. Bedard, Esq., of Franzen & Salzano P.C., and David Kaminski, Esq., of Carlson & Messer LLP. These ACA MAP attorneys have been at the forefront of the notable case, *Leckler vs. Cashcall*, and will explain how the TCPA affects your everyday business practices.

- Learn the purpose and overview of the TCPA;
- Review the FCC Order on TCPA;
- Explore practical suggestions for implementation;
- Discover what you can and can't do when using autodialers, cell phones and leaving messages;
- Have the chance to ask the experts your own questions!

**New format!** Campus ACA teleseminars now feature a 60-minute presentation and 30-minutes of interactive discussion. This change is to better serve you! Increase the value of your educational experience by having the opportunity for a lengthened question and answer session with the presenters via a "virtual chat."

**Can't attend?** Order a CD instead! **Check here** ☐ and return your completed form and payment. CD $129 (members) or $194 (non members) + 10 % Shipping & Handling or order online at ACA's online store! (Please allow three weeks for delivery.) CDs are in MP3 format and are playable on your computer with most media players (such as Windows Media Player), or on any MP3 compatible stereo.

---

**Register online today at:**
www.acainternational.org/teleseminar

### REGISTRATION IS SIMPLE! *(Please print clearly)*
Complete the registration form below and return it, along with payment to:
ACA International, Teleseminar Dept., P.O. Box 390106, Minneapolis, MN 55439-0106; or fax form with credit card payment to +1(952) 922-6402.
*Your registration fee includes one online log-in, telephone connection and one full set of materials per site. <u>One registration fee per location.</u>*

Name _____

Firm/Company _____

ID# _____Telephone _____

E-mail _____

☐ If ordering a CD, please check here to indicate you understand it is only available in MP3 format.

**ATTENTION:** All registrations and payments must be received by **12:00 Noon (Central), February 23, 2009**. Any registrations received after that time will not be given access to the teleseminar. Sorry for any inconvenience. Any registrations received after the cutoff will be notified.

### PAYMENT OPTIONS
Teleseminar Fee: Member $129, Non member $194
*Registration and payment must be received by **12:00 Noon Central, Monday, February 23, 2009**.*

Check one *(payment **MUST** accompany registration):*

☐ **Payment enclosed** *(make checks payable to ACA International)*

☐ **Bill my credit card:** ☐ Visa ☐ MasterCard ☐ Am. Ex.

Name on Card _____

Acct. # _____Exp. Date _____

Signature _____

**CANCELLATION POLICY**
Cancellations must be received no later than 48 hours prior to the teleseminar. Please note that if you don't cancel and don't attend, you are still responsible for full payment. ACA reserves the right to cancel or modify the program or substitute speakers. If ACA should cancel the program, registrants will receive a full refund. Cancellation fee after February 23rd is $30.00.
**PLEASE NOTE:** Teleseminar confirmations and packets will be accessed through E-mail. **If you <u>do not</u> have e-mail access please note on this form.**

---

If you do not wish to receive facsimile advertisements and solicitation from ACA International, please email ACA at faxoptout@acainternational.org, call ACA at +1(952) 926-6547, or send a fax to +1(952) 928-3837. In your opt out request, you must indicate the fax number(s) to which you do not want sent further advertisements or solicitations.